**In the Interest of T. E. T.**

**No. B–8721.**

Supreme Court of Texas.

July 16, 1980.

Rehearing Denied Sept. 12, 1980.

Elick & Elick, John V. Elick, Bellville, for petitioner.

George R. Moorman, Brenham, Cole, Panzica & Vestal, Inc., Warren Cole, Houston, for respondent.

BARROW, Justice.

This suit was brought by Catholic Charities of the Diocese of Galveston-Houston to terminate the parent-child relationship of an infant illegitimate girl (T.E.T.). The biological father filed a cross-action seeking to legitimate the child and be awarded custody. The trial court rendered judgment on

the jury verdict [1] that (1) the parent-child relationship between the mother and T.E.T. be terminated; (2) the father's petition to legitimate T.E.T. be denied and all of his rights to the child be foreclosed; and (3) Catholic Charities be appointed managing conservator of T.E.T. The biological father appealed and the court of civil appeals affirmed. 583 S.W.2d 484.

The primary question presented is whether portions of the Texas Family Code deny equal protection as guaranteed by the United States Constitution [2] to the biological father who has not established a substantial family relationship with the illegitimate child. We hold that the Family Code does not violate this constitutional guarantee and affirm the judgments of the courts below.

The child, T.E.T., was born in 1977. T.E.T.'s mother was fourteen and a freshman in high school and T.E.T.'s father was eighteen and a senior in the same school when the child was conceived. They were not married and, in fact, the girl was forbidden by her parents to have dates alone with a boy before she reached sixteen years of age. After much consideration and discussion of her alternatives with her parents and the father, the pregnant girl went to a home for unwed mothers operated by Catholic Charities. After additional counseling with respect to keeping the child or permitting its adoption, the mother concluded that it was in the best interest of the child to relinquish her parental rights and allow the child to be adopted. After T.E.T. was born, the mother executed an Affidavit of Relinquishment of Parental Rights, pursuant to Section 15.03.[3]

Under the Family Code the parent-child relationship is a legal status which carries with it certain rights, privileges, duties and powers. This status does not necessarily exist between mother or father and child, but rather exists between a "parent" and child. A "parent" is defined in Section 11.01(3):

"(3) 'Parent' means the mother, a man as to whom the child is legitimate, or an adoptive mother or father, but does not include a parent as to whom the parent-child relationship has been terminated."

Section 12.02 describes when a child is the legitimate child of his father as follows:

"(a) A child is the legitimate child of his father if the child is born or conceived before or during the marriage of his father and mother.

"(b) A child is the legitimate child of his father if at any time his mother and father have attempted to marry in apparent compliance with the laws of this state or another state or nation, although the attempted marriage is or might be declared void, and the child is born or conceived before or during the attempted marriage.

"(c) A child is the legitimate child of a man if the man's paternity is established under the provisions of Chapter 13 of this code."

Chapter 13 of the Family Code authorizes the biological father of an illegitimate child to establish his status as a parent as follows:

"§ 13.21  Voluntary Legitimation

.     .     .     .     .

"(b) The court shall enter a decree designating the child as the legitimate child of its father and the father as a parent of the child if the court finds that:

.     .     .     .     .

"(3) the mother or the managing conservator, if any, has consented to the decree.

1. The jury found substantially as follows:
   No. 1. "We do" find that it would be in the best interest of the child to terminate the parental rights of the mother.
   No. 2. We find that it is in the best interest of the child that the father "should not be designated her parent." (Emphasis added.)

2. Petitioner does not address the question of the application of the Texas Equal Rights Amendment. See Article 1, Section 3a, of the Texas Constitution.

3. Unless otherwise noted, references to sections are to sections of the Texas Family Code.

"(c) The requirement of consent of the mother is satisfied if she is the petitioner. If the entry of the decree is in the best interest of the child, the court may consent to the legitimation of the child in lieu of the consent of the mother or managing conservator."

This Court recently upheld the constitutionality of the statutory procedure in question. *See In the Interest of K*, 535 S.W.2d 168 (Tex.), *cert. denied*, 429 U.S. 907, 97 S.Ct. 273, 50 L.Ed.2d 189, *reh. denied*, 429 U.S. 1010, 97 S.Ct. 542, 50 L.Ed.2d 620 (1976). We said:

"There is a rational basis for the state, which has an interest in securing stable homes and supportive families for children, to distinguish between the father who has accepted the legal and moral commitment to the family and the father who has not done so. The biological father may be a sperm donor or a rapist or someone as S.D.A. who has simply engaged in a single hit and run sexual adventure. He may, on the other hand, be devoted to child and family even though the legal contract has not been sealed. Texas law offers the biological father of an illegitimate child the opportunity to prove which category in which he falls and to show that he should not be treated differently from fathers legally committed to the mothers of their children. Thus S.D.A. sought and received a fair hearing. The evidence proved him to be an unfit person to act as parent of this child, and the denial of his petition for parental status was shown to be in the best interest of the child. His rights have been respected. The rights of society and baby girl K permit him nothing more."

Petitioner urges that our holding should be reexamined in view of the writing of the United States Supreme Court in *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and in *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979). These cases are distinguishable and do not mandate a holding that the Texas Family Code denies the biological father of an illegitimate child the equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

·In *Craig v. Boren, supra,* the United States Supreme Court held that an Oklahoma statute which prohibited the sale of 3.2% beer to males under the age of twenty-one and to females under eighteen constituted a denial to males eighteen to twenty years of age of the equal protection of the laws in violation of the Fourteenth Amendment. The Supreme Court did not strike down all gender-based classifications, but simply required that such a classification serve important governmental objectives and be substantially related to achievement of these objectives.

In *Caban v. Mohammed, supra,* the United States Supreme Court by a 5–4 vote struck down as unconstitutional the gender-based distinction in the New York adoption consent statute between an unwed mother of the child and the unwed biological father. Under the New York law, an unwed mother could veto an adoption, but an unwed father could not, even if the adoption by the biological father was in the child's best interest. The Court made it clear that its *Caban* opinion must be read in the light of the unusual circumstances of the case.

There the unmarried parents had lived together for five years as husband and wife, during which period two children were born to them.[4] They then separated and the mother married Mohammed. Eventually Mohammed sought to adopt the children with the mother's consent. The facts of the *Caban* case illustrated the injustice of that discrimination as applied to parents who had lived as a family unit for years.

The limited extent of the *Caban* holding is emphasized by the issue as drawn by the dissent of Justice Stevens:

---

4. Under Texas law, the children could have been declared legitimate children since they were born of the purported common law marriage. *See* Section 12.02(b).

"With this much the Court does not disagree; it confines its holding to cases such as the one at hand involving the adoption of an *older* child against the wishes of a natural father who previously has participated in the rearing of the child and who admits paternity . . . ."

The majority itself states:

"Even if the special difficulties attendant upon locating and identifying unwed fathers at birth would justify a legislative distinction between mothers and fathers of newborns, these difficulties need not persist past infancy. When the adoption of an older child is sought, the State's interest in proceeding with adoption cases can be protected by means that do not draw such an inflexible gender-based distinction as that made in § 111. In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child. . . ."

The *Caban* Court carefully pointed out that appropriately limited distinctions between the rights of the mother and the rights of the father are not necessarily improper. In fact, by a footnote, the *Caban* opinion added this qualification: "We note some alternatives to the gender-based distinction of § 111 only to emphasize that the state interests asserted in support of the statutory classification *could be protected* through numerous other mechanisms more closely attuned to those interests." (Emphasis added.)

The Texas voluntary legitimation statutes differ from the New York statute in that our Family Code does give the biological father reasonable opportunity to establish his status as a "parent." Once this is done, he has equal rights with the mother who is identified as the child's parent at birth. Section 13.21 provides in part that the court shall render a decree designating an illegitimate child as the legitimate child of its father and the father as a "parent" if the mother or managing conservator has consented to the decree, or in the absence of such consent, if the court finds that such decree is in the best interest of the child. Section 13.09 provides that the effect of a decree designating the alleged father as the "parent" of the child is to create the parent-child relationship with the child as if the child were born to the father and mother during marriage. The father then has the same rights, privileges, duties and powers as the mother. Thus it is seen that, contrary to the New York statute, a mother cannot veto the father's acquisition of full parental rights.

A similar distinction was noted by the California court recently in rejecting the contention of a biological father that under the *Caban* holding the California adoption statute denied him the equal protection guaranteed by the Fourteenth Amendment. The Court pointed out that California (like Texas) grants the biological father an opportunity to establish by the best interest rule his status as a parent. *W. E. J. v. Superior Court of Los Angeles*, 100 Cal. App.3d 303, 160 Cal.Rptr. 862 (1979) (Hearing denied by the California Supreme Court, 1980).

The Texas Family Code recognizes that the individual child's interest is paramount in each contested voluntary legitimation case. The validity of the "best interest rule" was specifically approved by the United States Supreme Court in *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). In *Quilloin*, the Supreme Court unanimously upheld a Georgia statute which permits the biological father to legitimate his child only upon a showing of best interest of the child. It should be noted that the Georgia Code is very similar to the Texas Family Code regarding the rights of the father of an illegitimate child. Although the Supreme Court did not there consider a gender-based distinction, *Quilloin* rejected the contention that the equal protection clause requires that all biological fathers be treated equally. The Supreme Court expressly held that the Georgia statute conferring upon the fathers of legitimate children the right to veto adoption of the children while denying that right to the

fathers of illegitimate children did not violate the equal protection clause.

■ The narrow issue before us is whether the gender-based distinction of the Texas statutory scheme for establishing status as a parent is substantially related to the important state objective of promoting the best interest of children born out of wedlock and is substantially related to the achievement of this objective. We hold that it is so related. We believe that in the light of the "special difficulties" a mother faces at the birth and during the infancy of an illegitimate child this slight legislative distinction is justified. *See Caban v. Mohammed, supra.*

We pointed out in *K* that there is a rational basis for the State to distinguish between the father who has accepted the legal and moral commitment to the family and the father who has not done so. The *Caban* holding, as heretofore pointed out, is supported by the fact that the father there had established a family relationship with the children. The State has a valid objective in requiring the biological father to establish his "status" as a parent. Otherwise, we would recognize a sperm donor, a rapist, a "hit and run" lover, an adulterer and the like in the same legal status as a father who had accepted the legal and moral commitment to his family. While recognizing this valid distinction, Texas law offers the biological father of an illegitimate child the opportunity to prove in which category he belongs.

Furthermore, the State has a legitimate interest in protecting the children who are born as a result of pre-marital sexual activity. The mother, by virtue of her pregnancy, is automatically responsible for the child. She has the physical burdens and responsibilities of the pregnancy. She can choose to abort the child or she may carry it full term. The State has a substantial interest in encouraging the unwed mother to properly care for the child by assuring her that her wishes as to the disposition of the child will not, absent her consent or a finding of the child's best interest, be subject to the absolute veto of the biological father.

This statute is substantially related to the achievement of that interest.

On the other hand, the biological father is not automatically responsible for the child. He may not have an interest in legitimating the child. He may not promptly disclose his interest in the child. In most situations, he can wait until after the child is born before committing himself. While the mother who is unmarried and pregnant is trying to figure out what she will do with the child, the father is totally free from any responsibility with respect to the child. To classify him as a parent simply because he is the biological father would give him a powerful club with which he could substantially reduce the options available to the unmarried mother. All must agree that an unmarried fourteen-year-old high school freshman has a serious problem when she discovers she is pregnant and she needs all the options that the State can properly make available to her.

It is easy to understand her decision here that it would not be in the child's best interest for her to be turned over to the nineteen-year-old father and be reared by him in the small town where the illicit sexual activity occurred. On the other hand, the best interests of the illegitimate child will more likely be served by her adoption into a family who will give her the stability of a normal, two-parent home. Moreover, adoption will remove the stigma under which an illegitimate child suffers.

■ The biological father was given timely notice of the proceedings to terminate the mother's parental rights and, in response, brought suit as permitted under the Texas Family Code to legitimate the child. He thus had the procedural due process required by *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). A full and complete trial was had on the question of whether it was in the child's best interest that the child be legitimated. The jury found that it was not in the child's best interest and no complaint is made as to the sufficiency of the evidence to support such finding. Our facts differ sharply from those in *Caban* as the biological father here

had never had a family relationship with the child. In fact, he had never lived with, raised, or established any kind of relationship with the child, having seen her only the one time shortly after her birth.

We hold that Section 13.21(b)(3) and (c) of the Family Code do not deny to the biological father, who has not established a substantial family relationship with the child, the equal protection guaranteed by the Fourteenth Amendment to the United States Constitution.

Petitioner urges by several points of error that the court of civil appeals erred in not reversing the judgment of the trial court and remanding the cause for a new trial because of certain procedural errors in the trial of the case. These complaints are primarily based on his contention that the mother and Catholic Charities were not antagonistic parties and the trial court should not have given each party six jury strikes and additional time for jury argument. The problem with this contention is that the cause began as a suit by Catholic Charities to terminate the parent-child relationship of the mother. This issue remained in the case and was submitted to the jury. Nevertheless, these parties were united by their pleadings and in spirit against the petitioner's petition for paternity and custody. The mother and Catholic Charities have been represented by unrelated attorneys throughout the cause and there is no indication in the record of any collaboration either in the selection of the jury or in the presentation of the argument to the jury.

We agree with the court of civil appeals that the question of the number of jury strikes was not properly preserved by petitioner. Although inquiry was made by petitioner of the trial court as to how many strikes each party would be entitled to make, there was no objection by him upon explanation by the trial court that each of the parties would be entitled to six strikes. Thus, petitioner waived any complaint to this alleged error.

We also agree with the court of civil appeals that reversible error has not been shown by the other procedural errors asserted by petitioner.

The judgment is affirmed.

STEAKLEY, J., dissenting in which POPE and SPEARS, JJ., join.

STEAKLEY, Justice, dissenting.

I respectfully dissent.

I agree that the State may constitutionally require an unwed father to establish that he is the biological father, a burden understandably not required of the unwed mother. But when the father has demonstrated this concern for and interest in his child, it is my opinion that he is thereafter entitled to the constitutional guarantee of equal protection. This is denied him by Section 13.21[1] of the Texas Family Code under which the unwed mother may withhold consent and thereby require the father to discharge the additional burden of establishing that recognition of his fatherhood would be in the best interest of the child.

The statutory scheme of the Texas Family Code in question makes two gender-based distinctions. In the first place, the effect of

1. § 13.21. Voluntary Legitimation
    (a) If a statement of paternity has been executed by the father of an illegitimate child, the father or mother of the child or the State Department of Public Welfare may file a petition for a decree designating the father as a parent of the child. The statement of paternity must be attached to the petition.
    (b) The court shall enter a decree designating the child as the legitimate child of its father and the father as a parent of the child if the court finds that:

(1) the parent-child relationship between the child and its original mother has not been terminated by a decree of a court;
(2) the statement of paternity was executed as provided in this chapter, and the facts stated therein are true; and
(3) the mother or the managing conservator, if any, has consented to the decree.
    (c) The requirement of consent of the mother is satisfied if she is the petitioner. *If the entry of the decree is in the best interest of the child, the court may consent to the legitimation of the child in lieu of the consent of the mother or managing conservator.* (Italics added).

Sections 11.01(3), 12.01 and 12.02 [2] is that a child is legitimate to its unwed natural mother, but illegitimate to its unwed natural father. This classification serves and is substantially related to the governmental objective of maximizing accuracy and certainty in the determination of paternity of a child born out of wedlock. It recognizes the biological fact that the woman carries and gives birth to the child, while the man's biological role ends at conception. The larger sphere of physical possibilities for the identity of the child's natural father logically requires that paternity be established by factual proof, such as medical testimony of genetic compatibility and physical access.

Additionally, Sections 13.21(b)(3) and 13.-21(c) require either that the natural mother or the managing conservator consent to legitimation or, in the absence of such consent, the trial court consent, if it finds that legitimation is in the best interest of the child. The statutory consent requirement distinguishes between men and women by requiring an unmarried man who has factually established that he is the natural father of the child to clear yet another hurdle of obtaining consent. In the event the court's consent is necessary, the natural father must carry the additional burden of proving that legitimation is in the best interest of the child. The State places no corresponding burden on the natural mother.

The majority's reliance on *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) and *In the Interest of K*, 535 S.W.2d 168 (Tex.1976) is misplaced. Because the father in *Quilloin, supra*, failed to preserve the gender-based equal protection argument, *id.* 434 U.S. at 253, n.13, 98

S.Ct. at 554, n.13, the Supreme Court only discussed the disparate treatment between unwed fathers and married fathers. *In the Interest of K, supra*, was decided before *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) and *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) which make clear that gender-based classifications must serve important governmental objectives and be substantially related to the achievement of those objectives. The rational basis test used in *In the Interest of K*, is no longer relevant to the gender-based classification at issue here.

I point out further that *In the Interest of K*, relied on *In re Adoption of Malpica-Orsini*, 36 N.Y.2d 568, 370 N.Y.S.2d 511, 311 N.E.2d 486 (1975), in ruling that the Texas Family Code did not deprive an unwed father of the equal protection of the law. But the U. S. Supreme Court in writing *Craig v. Boren, supra*, and *Caban v. Mohammed, supra*, said this about *Orsini* :

In *Orsini v. Blasi*, [423 U.S. 1042, 96 S.Ct. 765, 46 L.Ed.2d 642] supra, the Court dismissed an appeal from the New York Court of Appeals challenging the constitutionality of § 111 as applied to an unmarried father whose child had been ordered adopted by a New York Surrogate. In dismissing the appeal, we indicated that a substantial federal question was lacking. This was a ruling on the merits, and therefore is entitled to precedential weight. See *Hicks v. Miranda*, 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). At the same time, however, our decision not to review fully

2. Section 11.01.
  (3) "Parent" means the mother, a man as to whom the child is legitimate, or an adoptive mother or father, but does not include a parent as to whom the parent-child relationship has been terminated.
  Section 12.01.
  A child is the legitimate child of his mother.
  Section 12.02.
  (a) A child is the legitimate child of his father if the child is born or conceived before or during the marriage of his father and mother.

  (b) A child is the legitimate child of his father if at any time his mother and father have attempted to marry in apparent compliance with the laws of this state or another state or nation, although the attempted marriage is or might be declared void, and the child is born or conceived before or during the attempted marriage.
  (c) A child is the legitimate child of a man if the man's paternity is established under the provisions of Chapter 13 of this code.

the questions presented in *Orsini v. Blasi* is not entitled to the same deference given a ruling after briefing, argument, and a written opinion. See *Edelman v. Jordan*, 415 U.S. 651, 671, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Insofar as our decision today is inconsistent with our dismissal in *Orsini*, we overrule our prior decision.

*Caban, supra*, 441 U.S. at 390, n.9, 99 S.Ct. at 1767, n.9.

Further, citing *Craig v. Boren, supra*, the U. S. Supreme Court stated in *Caban* that to withstand judicial scrutiny under the Equal Protection Clause of the Fourteenth Amendment gender-based distinctions must serve important government objectives and be substantially related to achievement of those objectives. The Court wrote:

> Even if unwed mothers as a class were closer than unwed fathers to their newborn infants, this generalization concerning parent-child relations would become less acceptable as a basis for legislative distinctions as the age of the child increased. The present case demonstrates that an unwed father may have a relationship with his children fully comparable to that of the mother.
>
> Appellant Caban, appellee Marie Mohammed, and their two children lived together as a natural family for several years. As members of this family, both mother and father participated in the care and support of their children. There is no reason to believe that the Caban children—aged 4 and 6 at the time of the adoption proceedings—had a relationship with their mother unrivaled by the affection and concern of their father. We reject, therefore, the claim that the broad, gender-based distinction of § 111 is required by any universal difference between maternal and paternal relations at every phase of a child's development.

. . . . .

> The State's interest in providing for the well-being of illegitimate children is an important one. We do not question that the best interests of such children often may require their adoption into new families who will give them the stability of a normal, two-parent home. Moreover, adoption will remove the stigma under which illegitimate children suffer. But the unquestioned right of the State to further these desirable ends by legislation is not in itself sufficient to justify the gender-based distinction of § 111. Rather, under the relevant cases applying the Equal Protection Clause it must be shown that the distinction is structured reasonably to further these ends.

. . . . .

> We find that the distinction in § 111 between unmarried mothers and unmarried fathers, as illustrated by this case, does not bear a substantial relation to the State's interest in providing adoptive homes for its illegitimate children.

Id. at 389–91, 99 S.Ct. at 1766–1767.

The majority discusses the opportunities for the unwed father to avoid automatic responsibility for the child, an option not biologically available to the unwed mother. It should be emphasized that in this case the natural father repeatedly attempted to establish a relationship with the child, and, indeed, was permitted some limited visitation with her. Moreover, there are letters in the record written by the mother to the father that led the father to believe that it was her wish that the father have the baby. However, the father's access to the child was discouraged and limited by the adoption agency, which had physical possession of the child at the request of the mother.

In my view, the discrimination against the unwed father in the Family Code is not justified by the promotion to any substantial extent of the State's objectives mentioned by the majority; and I certainly cannot agree with the assertion by the majority that the difference in the statutory treatment of unwed fathers and mothers is "slight."

I am in accord with the rationale of the Supreme Court of Missouri in *J.D.S. v. Edwards*, 574 S.W.2d 405 (Mo.1978) *en banc.*

In *J.D.S.*, an unwed father sought custody of his illegitimate son. The mother had relinquished her parental rights and given the child for adoption. In formulating a standard to determine the unwed father's substantive due process rights, the Court stated:

> . . . A legislative recognition of married fathers' presumption of fitness is manifest in the high level of proof required by the statute to support a finding of unfitness as to them. However, we believe that an unwed father initially has no such strong presumption of parental fitness. The State is not constitutionally required to accord such presumption. Instead the State is free to require an unwed father first to prove that he has seasonably demonstrated a meaningful intent and a continuing capacity to assume responsibility with respect to the supervision, protection and care of the child, and the trial court in these proceedings should at the outset examine the extent of such parental concern and capacity as may have been demonstrated by the putative father. On a finding of such concern and capacity, the father is then cloaked with the benefit of the presumption of fitness essentially the same as that enjoyed by other parents and the burden becomes the petitioner's to show by "clear, cogent and convincing evidence," unfitness, waiver or other disqualification of the sort described in § 211.441, RSMo 1969.

*Id.* at 408–09. The Court recognized that *Quilloin* approved the "best interests of the child" standard but rejected it in favor of a more lenient standard under the Missouri Constitution.

> . . . This standard [best interest] presents the difficulty that an unwed father, though he may have shown great parental concern, must compete with adoptive parents to establish not only that he is a suitable parent (i. e., meeting a charge of unfitness), but also that he is the most suitable of those seeking custody of the children. For those unwed fathers who are fit, and who have demonstrated such parental concern, the standard approved by the U. S. Supreme Court in *Quilloin* seems to represent a diminution of the protection afforded by the due process and equal protection clauses of the United States Constitution set forth in *Stanley*. We are disinclined to so dilute these important rights. We hold that the Missouri Constitution, art. I, §§ 2 and 10, requires as the appropriate minimum standard that the same presumption of fitness afforded married fathers in parental termination proceedings be afforded to natural fathers after a reasonable showing of fatherly concern in such cases.

*Id.* at 409.

Finally, I point out that the majority does not address the Texas Equal Rights Amendment which states,

> Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative.

Tex.Const. art. I, § 3a.

This provision has been in the Texas Constitution since 1972. The majority does not decide if the Texas Constitution provides less, greater or the same protection as the Fourteenth Amendment. *See* Schoen, *The Texas Equal Rights Amendment*, 15 Houston L.Rev. 537 (1978) where Professor Schoen proposes several tests, and argues that the use of any single test "will undermine the objectives of the Texas ERA." *Id.* at 586. *See* also, Sampson, *The Texas Equal Rights Amendment and The Family Code: Litigation Ahead*, 5 Texas Tech.L. Rev. 631 (1972).

Other State Courts have faced the Equal Rights Amendment issue and have adopted rules with which to test the constitutionality of gender-based classifications. The Massachusetts Supreme Court adopted the strict scrutiny test that the United States Supreme Court utilizes to test laws that affect fundamental rights or make suspect classifications. Thus, in *Attorney General v. Interscholastic Athletic Assoc.*, —— Mass. App. ——, 393 N.E.2d 284 (Mass.1979), that Court held that gender-based classifications

must further a demonstrably compelling interest and limit its impact as narrowly as possible consistent with the legitimate purpose. *See People v. Ellis,* 57 Ill.2d 127, 311 N.E.2d 98 (1974). In *Commonwealth v. Butler,* 458 Pa. 289, 328 A.2d 851 (1974), the Court stated that gender can no longer be accepted as an exclusive classifying tool. The Maryland Court of Appeals held that sex cannot be a factor in legislative classifications. *Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977). Washington interprets the Equal Rights Amendment as a prohibition of classifications based on gender. *Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882 (1975); *Welfare of Jeffrey Lee Hauser,* 15 Wash.App. 231, 548 P.2d 333 (1976).

We considered this problem in *Mercer v. Board of Trustees, North Forest Independent School District,* 538 S.W.2d 201 (Tex. Civ.App.—Houston [14th Dist.] 1976, writ ref'd n. r. e.). In *Mercer,* after quoting *Darrin v. Gould, supra,* the Court wrote:

We cannot agree with the Supreme Court of Washington that the ERA admits of no exceptions to its prohibition of sex discrimination. Any classification based upon sex is a suspect classification, and any law or regulation that classifies persons for different treatment on the basis of their sex is subject to strictest judicial scrutiny. Any such classification must fall unless the party defending it can show that it is required by (1) physical characteristics, (2) other constitutionally protected rights such as the right of privacy, or (3) other "compelling reasons." With respect to "physical characteristics" we are simply recognizing the

facts of life. For us to adjudicate that women are men would be as futile as it would be absurd. Neither the ERA nor the rights established by it require us to construe it so as to deny sexual or reproductive differences between the sexes. Nor does the ERA require that such rights so established (and so long denied) be enforced where they come into conflict with other basic fundamental constitutionally-protected rights such as that of privacy. To justify a suspect classification by "compelling reasons" places the burden of proof and persuasion on the party defending the classification.

*Mercer, supra,* at 206. For an analysis of *Mercer,* see Schoen, *The Texas Equal Rights Amendment,* 15 Houston L.Rev. 537, 568–72 (1978).[3]

Under *Mercer,* the Equal Rights Amendment makes gender a "suspect" class and to withstand scrutiny, a statute that makes a gender-based distinction must further a compelling interest and represent the narrowest and least restrictive means by which that objective can be achieved. Under the Texas Family Code only unwed father's rights are involuntarily terminated by the best interest of the child standard. All other parents, including the unwed mother, are protected from the involuntary termination of their parental rights by Chapter 15 of the Family Code. Section 15.02 provides that to involuntarily terminate the rights of a parent the Court must find that the parent committed the acts specified in § 15.02. "Parent" is defined in a manner that excludes unwed fathers, § 11.01(3); he is thus not afforded the protection of § 15.02.

**3.** The sex equality provision of the Texas ERA is not simply window dressing added to the state constitution as a sop for a few overwrought but vocal citizens. Adoption of the Texas ERA, considered in its contemporary social, political, and legal context, is inconsistent with a view that nothing has changed or should change. The law cannot be changed and yet remain unchanged, unless the plain language of the state constitution is ignored. Amending the state constitution is scarcely necessary to preserve the *status quo ante,* and inclusion of a specific and unqualified guarantee of sex equality seems a peculiar means to perpetuate the sex-based discrimination of the past. Finally,

an obvious but occasionally overlooked fact should be noted. When the law imposes burdens, confers benefits, or otherwise distinguishes between persons because of sex, the basis for different treatment, sex, is a characteristic over which a person has no control, an "immutable characteristic determined solely by the accident of birth."

Schoen, 15 Houston L.Rev. at 587. But see the concurring opinion in *Darrin v. Gould, supra,* where the concurring justice expresses his doubts that the voters intended all of the consequences of the Equal Rights Amendment's adoption.

There is no constitutionally acceptable basis for this discrimination.

POPE and SPEARS, JJ., join in this dissenting opinion.