IN THE SUPREME COURT OF TEXAS
════════════
No. 
02-0244
════════════
In The Interest of L.M.I. and J.A.I., minor 
children  
════════════════════════════════════════════════════
On Petition 
for Review from the
Court of 
Appeals for the Fourteenth District of Texas
════════════════════════════════════════════════════  

Argued on February 
5, 2003  
            Justice O’Neill delivered the Court’s 
judgment, and the opinion of the Court as to Parts I, II, and IVA, in which 
Justice Enoch, Justice Schneider, Justice 
Smith, and Justice 
Wainwright joined, and an opinion as to Part III and IVB, in which Justice Enoch, Justice Schneider, and Justice Smith joined.  
Justice Wainwright delivered a 
concurring opinion.  
            Justice Owen delivered a concurring and 
dissenting opinion, joined by Chief 
Justice Phillips as to all Parts, and joined by Justice Hecht and Justice Jefferson as to Part 
III. 
            
Justice 
Hecht delivered a dissenting opinion, joined by Justice Jefferson as to all parts, and 
joined by Justice Owen as to Parts 
I, IIA, IIIA, and IIIB.  
            Almost 
four years ago, Ricardo Duenas and Luz Sylvestre Inocencio signed sworn 
affidavits of voluntary relinquishment of their parental rights to 
five-month-old twin boys. At the same time, they placed the boys in the care of 
Miles and Monica Montegut, a couple who wanted to adopt them. The boys have 
grown from infants to toddlers to pre-school age children in the Monteguts’ care 
as this case has taken its excruciatingly slow course through our judicial 
system. Duenas and Inocencio have been represented by counsel since the 
beginning of their quest to set the affidavits aside. As today’s fractured 
opinions illustrate, appellate review has been greatly hampered by the shifting, 
indistinct focus of their complaints – although the case has been pending for 
more than a year, we still disagree about what the complaints are and whether 
they were preserved. In this context, adhering to our preservation rules isn’t a 
mere technical nicety; the interests at stake are too important to relax rules 
that serve a critical purpose. As we recently said, “[a]ppellate review of 
potentially reversible error never presented to a trial court would undermine 
the Legislature’s dual intent to ensure finality in these cases and expedite 
their resolution.” In re B.L.D. and B.R.D., ____ S.W.3rd ___, ___ (Tex. 
2003); see also Tex. Fam. 
Code § 161.211(a) (prohibiting direct or collateral attack on order 
terminating parental rights based on affidavit of relinquishment after six 
months). Injecting any greater uncertainty and complexity into the process would 
only serve to discourage potential adoptive parents, who are already turning to 
simpler and less expensive foreign adoptions in record numbers. See 
Genard C. Armas, Many U.S. Parents Look Abroad to Adopt, Census Bureau 
Says, Miami Herald, Aug. 22, 
2003, available at 
http://www.miami.com/mld/miamiherald/2003/08/22/news/nation/6591007.htm; United States Census bureau, United States 
Department of Commerce, Adopted Children Stepchildren: 2000 11 (Aug. 
2003).
            Here, 
after hearing evidence regarding the circumstances surrounding the affidavits’ 
execution and the boys’ best interests, the trial court ordered termination of 
Duenas’s and Inocencio’s parental rights. The court of appeals affirmed. ___ 
S.W.3d ___. Duenas argues that the affidavit he signed was procured in a manner 
that violated his right to due process because he neither speaks nor reads 
English, and the affidavit was not translated into Spanish. We granted Duenas’s 
petition for review to consider this constitutional issue, but on further review 
we conclude that the issue was not preserved. We also granted Inocencio’s 
petition for review to decide whether the order terminating her parental rights 
should be set aside because her relinquishment affidavit was procured as the 
result of fraud or undue influence. A majority of the Court concludes that the 
record contains legally sufficient evidence to support termination of her 
parental rights. Accordingly, we affirm the court of appeals’ judgment.   
I  
            In 
April 1999, fifteen-year-old Inocencio gave birth prematurely to twin boys, 
L.M.I. and J.A.I., allegedly fathered by twenty-five-year-old Ricardo Duenas. 
Duenas and Inocencio were not married or living together at the time. At some 
point before the boys’ birth, Inocencio had become acquainted with Texas City 
police detective Brian Goetschius, who had responded to a report that Inocencio 
was working as a nude dancer at a sexually oriented business. Detective 
Goetschius began offering Inocencio occasional advice, sometimes at her mother’s 
behest. After learning of her pregnancy, Goetschius drove Inocencio to several 
doctor’s appointments and helped her apply for governmental assistance. Five 
months after the boys were born, Inocencio’s sister, Esther Gonzalez, contacted 
the detective asking for help in placing the children for adoption. Eventually, 
Goetschius and his wife, Dawnell, arranged for the children to be adopted by 
Monica and Miles Montegut, Dawnell’s sister and brother-in-law. 
             On 
September 24, 1999, Gonzalez went to her mother’s home, where Inocencio and the 
boys lived, and told Inocencio that the Monteguts wanted to adopt the children. 
Gonzalez, Inocencio, and their mother, Guillerma Pruitt, all testified that 
Inocencio at first rejected the idea of allowing the adoption, but was 
ultimately persuaded that it would be in the boys’ best interest. Gonzalez then 
drove Inocencio, the twins, and Pruitt to pick up Duenas at the restaurant where 
he worked. The group proceeded to the office of the Monteguts’ attorney, Mark 
Ciavaglia, who had prepared irrevocable affidavits of relinquishment of parental 
rights for Inocencio and Duenas to sign. Duenas, a Honduran citizen, testified 
that he does not understand English, that none of the affidavit was translated 
for him, and that he did not understand the affidavit’s import. Other witnesses 
testified that Duenas appeared to understand Ciavaglia’s explanation of the 
affidavit, and that significant portions of the affidavit were translated. 
Ciavaglia then explained the affidavit to Inocencio, who testified that 
Ciavaglia advised her not to sign if she had any reservations. Inocencio 
initially refused to sign the affidavit, but changed her mind after the adoptive 
parents agreed to send her pictures and information about the boys’ condition 
twice a year. After both Inocencio and Duenas signed their respective 
affidavits, they left the boys with Ciavaglia to be surrendered to the 
Monteguts. 
            A 
few days later, Inocencio had a change of heart and decided to pursue legal 
action to regain custody of the children. On October 1, 1999, the Monteguts 
filed their petition to terminate the parent/child relationship. The same day, 
the trial court issued a temporary order giving the Monteguts custody of the 
children. Three days later, Inocencio filed a motion to revoke her affidavit. On 
November 17, 1999, Duenas filed his answer to the Monteguts’ petition and a 
counter-petition for voluntary paternity. He also filed a motion to revoke his 
affidavit of relinquishment. 
            On 
November 23, 1999, the trial court held a hearing on the motions to revoke the 
affidavits to determine whether the affidavits were executed involuntarily. 
After hearing testimony from nine witnesses, the trial court found that the 
affidavits were voluntarily executed. The court also found that Duenas was not 
the children’s presumed father, and that the legal parent-child relationship did 
not exist at the time Duenas signed his affidavit of relinquishment. The trial 
court further found by clear and convincing evidence that it was in the 
children’s best interest to terminate Duenas’s and Inocencio’s parental rights. 
The court ordered Duenas’s and Inocencio’s rights terminated, and awarded the 
Monteguts custody of the children. The court of appeals affirmed the trial 
court’s decision. ___ S.W.3d ___.   
II 
  
            Duenas’s 
petition for review argues that “the order terminating [his] parental rights 
should be set aside since [his] signature on the affidavit of relinquishment was 
procured in a manner that violated [his] due process rights.” Upon further 
review of the record, we conclude that Duenas failed to preserve this issue in 
the trial court. His answer and counterpetition to the termination proceedings 
cite no constitutional authority, and he did not raise the issue in any 
post-judgment motion. In fact, the only reference to the constitution in the 
entire record appears when Duenas’s attorney, in arguing for a continuance, 
explained that she had only recently been hired after Duenas’s coworkers told 
him that the termination “was probably not constitutional and not right.” 
Duenas’s “Revocation of Affidavit” merely states that “[t]he Affidavit of 
Relinquishment was not translated for me.” The trial court obviously did not 
discern a due process challenge in Duenas's argument, because the court 
specifically found that “RICARDO DUENAS present[sic] issues of fraud, duress, 
and overreaching to the Court to deny that his Father's Affidavit of 
Relinquishment of Parental Rights was signed voluntarily.” See Vela v. 
Marywood, 17 S.W.3d 750, 760 (Tex. App. – Austin 2000, pet. denied, 53 
S.W.3d 684 (Tex. 2000) (noting that at common law “the word ‘fraud’ refers to an 
. . . omission, or concealment in breach of a legal duty . . . when the breach 
causes injury to another or the taking of an undue and unconscientious 
advantage”). 
            Duenas, 
who was represented by counsel, sought no finding and raised no legal argument 
before the trial court about a constitutional claim. Given that Duenas was 
afforded an extensive evidentiary hearing on the voluntariness of his affidavit, 
it was not apparent from the context that Duenas was attempting to raise a due 
process challenge. Under our Rules of Appellate Procedure, a party must present 
to the trial court a timely request, motion, or objection, state the specific 
grounds therefor, and obtain a ruling. Tex. R. App. P. 33.1. As noted above, 
allowing appellate review of unpreserved error would undermine the Legislature’s 
intent that cases terminating parental rights be expeditiously resolved, thus 
“‘[p]romot[ing] the child’s interest in a final decision and thus placement in a 
safe and stable home.’” In re B.L.D. and B.R.D., ___ S.W.3d at ___ 
(quoting In re J.F.C., 96 S.W.3d 256, 304 (Tex. 2002)). Both we and the 
United States Supreme Court have held that constitutional error was waived in 
comparable circumstances. See Webb v. Webb, 451 U.S. 493, 496-97 (1981) 
(holding that constitutional error was waived, even though petitioner repeatedly 
used the phrase “full faith and credit,” because petitioner did not cite to the 
federal Constitution or to any cases relying on the Full Faith and Credit Clause 
of the federal Constitution); Tex. Dep’t of Protective and Regulatory Servs. 
v. Sherry, 46 S.W.3d 857, 860-61 (Tex. 2001) (holding that alleged 
biological father who sought to establish paternity waived constitutional error, 
though it was undisputed that father had received no notice or hearing on prior 
paternity adjudication that created bar). Accordingly, we hold that the due 
process argument Duenas raises here was not preserved below. 
            And 
due process is the only argument that Duenas raises here. Nowhere does he 
present the issue that Justice Hecht and Justice Owen pose, that there is not 
clear and convincing evidence of a statutory ground for reversal. ___ S.W.3d at 
___(Hecht, J. dissenting); ___ 
S.W.3d at ___ (Owen, J., 
dissenting). At oral argument, Duenas’s attorney expressly disavowed any 
argument that his affidavit did not comply with the statute: 
JUSTICE OWEN: Are you also making 
a statutory argument that it doesn’t comply with the statute?
DUENAS’S ATTORNEY: As it relates 
to him, I’ve not made any statutory argument.
            OWEN: 
Your only argument was due process?
            CASEY: 
Yes.
                                    

That concession was entirely 
consistent with Duenas’s briefing, which states the issue presented is “Should 
the order terminating RICARDO’s parental rights be set aside since RICARDO’s 
signature on the affidavit of relinquishment of his parental rights was procured 
in a manner that violated RICARDO’s due process rights?” Because the only issue 
presented in Duenas’s petition for review was not preserved, we affirm the court 
of appeals’ judgment as to Duenas. 
III
            Inocencio 
argues that the order terminating her parental rights should be set aside 
because it was procured in exchange for unenforceable promises and as the result 
of illegal conduct by Detective Goetschius, his wife, and Esther Gonzalez. 
Inocencio argues that the Monteguts’ promise to provide periodic information and 
photographs of the boys was unenforceable as a matter of law, citing 
Vela. Because the promise was unenforceable, she argues, the promise 
fraudulently induced her to sign the affidavit of relinquishment.
            Inocencio 
filed no pleadings or post-trial motions in the trial court challenging the 
enforceability of the Monteguts’ promise, even though she, like Duenas, was 
represented by an attorney. The only documents Inocencio presented in the trial 
court were her “Revocation of Affidavit,” and a handwritten letter attached to a 
letter from the attorney who had been representing her mother in her effort to 
be named the twins’ managing conservator in which Inocencio states that “[t]he 
only reason [the boys] are not with us now is because of my sisters [sic] 
threats and badgering.” Inocencio’s revocation states only that “[i]t is my 
desire to revoke [the affidavit of relinquishment].” While there is evidence 
that the promise of pictures and updates played a significant role in 
Inocencio’s decision to sign the affidavit, her argument about the 
enforceability of that promise was never raised or ruled upon. Inocencio thus 
waived this challenge to the affidavit, and we express no opinion on it. See 
In re Barr, 13 S.W.3d 525, 555 (Tex. Rev. Trib. 1998); Tarrant County 
Water Control and Imp. Dist. Number One v. Fullwood, 963 S.W.2d 60, 72 (Tex. 
1998).
            Inocencio 
also contends that Detective Goetschius, his wife, and Gonzalez acted as 
adoption intermediaries without meeting the requirements of Chapter 42 of the 
Human Resources Code; consequently, she argues, their actions amount to undue 
influence in her decision to relinquish her parental rights. But like her 
argument regarding the purported unenforceability of the Monteguts’ promises, 
Inocencio never raised or secured a ruling on this theory in the trial court. 
Accordingly, it too is waived.
IV
A.
            A 
brief response to the dissenting justices’ depiction of the record in this case 
is warranted. Both dissents effectively second-guess the trial court’s 
resolution of a factual dispute by relying on evidence that is either disputed, 
or that the court could easily have rejected as not credible. Even under the 
standard we articulated in In re J.F.C., this reweighing of the evidence 
is improper. See In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). And in a 
case like this, where so much turns on the witnesses’ credibility and state of 
mind, appellate factfinding is particularly dangerous.
            Neither 
of the dissents, for example, credits evidence that Duenas understood English. 
This is important, because the evidence is undisputed that Ciavaglia went over 
the affidavit with Duenas in English, although he may have paraphrased parts of 
it. For example, Gonzalez testified that Ciavaglia “went step by step and made 
sure to – that [Duenas and Inocencio] understood what they were signing. . . . 
Mark [Ciavaglia] explained it in detail. And Ricardo kept on, like he 
acknowledged what was being said.” And Ciavaglia testified that he told Duenas 
that “[t]his document is very – excuse me – very important. And that by signing 
it, you’re acknowledging that you understand this document and you understand 
the consequences of this document, and that you fully, finally, and forever give 
up any parental rights to your children. And you also relinquish your right and 
give up your right to change your mind.” Ciavaglia also testified that he went 
“through the form and I was explaining it to [Duenas].”
    And 
Duenas’s testimony about his ability to understand English was inconsistent; 
although he testified that he understood no English whatsoever, he soon 
contradicted himself:
ATTORNEY AD LITEM: Mr. Duenas, I’m 
a little confused as to how much English you understand. Let me go over some 
testimony that I think you gave the court a little bit earlier.
 
When the lawyer told you in 
English to sign here and initial here, did you tell the Court that you 
understood that?
 
DUENAS: Yes, I did 
understand.

Duenas also submitted a Statement 
of Paternity in English and swore, in the attached verification, “that he has 
read the foregoing Statement of Paternity.” 
            Other 
witnesses testified that Duenas appeared to understand what was transpiring at 
the affidavit signing: 
Q: How did you receive the 
information from Ricardo Duenas?
 
CIAVAGLIA: I asked him 
verbally.
 
Q: And was he able to understand 
what you asked him and relay the information?
 
CIAVAGLIA: He seemed to be. He 
seemed to understand English and responded to questions.
 
Q: When you asked for his name, 
did he respond with his name correct – give you a detail of his name, or did he 
write it out? How did he do it?
 
CIAVAGLIA: He pronounced it, and I 
just wrote it. As I wrote his last name, I spelled it out loud; and he 
acknowledged that was correct.
 
And Gonzalez testified that after 
Duenas signed the affidavit, she told him in English, “Thank you. What you are 
doing is very courageous.” She then asked her mother to translate, but Duenas 
interrupted and told the mother it was unnecessary. Moreover, there was evidence 
that Duenas had been working four years for a chef who spoke only English. 
Although Duenas testified that a coworker translated the chef’s directions, the 
trial court may have found Duenas’s self-contradicted testimony that he 
understood no English after four years in this environment not credible. The 
trial court may also have found Duenas not credible because he testified that 
none of the affidavit had been translated for him, when every other witness 
testified that at least some portions of the affidavit were translated. In any 
event, the trial court had the opportunity to observe Duenas’s responses and 
demeanor; second-guessing the trial court’s factfinding in these circumstances 
is unwarranted and ill-advised.
B.
            Moreover, 
the dissenters’ assumption that Duenas’s mere biological relationship with the 
twins afforded him “rights, fundamental and constitutional in their magnitude” 
is questionable. As we have noted, the trial court found that Duenas was not the 
twins’ presumed father, and that Duenas had no legal relationship with the boys 
at the time he signed the affidavit. Duenas, a twenty-five-year-old man, admits 
that he fathered twin sons by a fifteen-year-old child who was incapable of 
legally consenting to a sexual relationship. Duenas signed the affidavit 
relinquishing his parental rights more than five months after the boys’ birth, 
while he was living with another woman. Until he filed a counterpetition for 
paternity in this case (five days before the scheduled termination hearing, 
almost two months after signing the relinquishment affidavit, and more than 
seven months after Inocencio gave birth to the twins), Duenas took no steps to 
establish parental rights. Moreover, Duenas did not request a full translation 
of the relinquishment affidavit, even though there was nothing to prevent him 
from doing so and he knew that the proceedings would affect the boys’ future. 
His failure to do so could be interpreted as disinterest. And there is evidence 
that Duenas contributed little, if any, to the boys’ support and daily 
care. 

 The record strongly 
suggests that Inocencio’s mother had assumed almost complete responsibility for 
the twins, and it is undisputed that she had moved to be named their managing 
conservator. The boys were receiving public assistance through the WIC program, 
and at one point there was an attempt to obtain child support from Duenas 
through the attorney general’s office. 
            The 
Supreme Court has made it abundantly clear that a man’s mere biological 
relationship with a child is insufficient to confer a protected liberty interest 
upon him. In Lehr v. Robertson, the Court explained:
The difference between the 
developed parent-child relationship that was implicated in Stanley and 
Caban, and the potential relationship involved in Quilloin [v. 
Walcott, 434 U.S. 246 (1978)] and this case, is both clear and significant. 
When an unwed father demonstrates a full commitment to the responsibilities of 
parenthood by “com[ing] forward to participate in the rearing of his child,” his 
interest in personal contact with his child acquires substantial protection 
under the due process clause. At that point it may be said that he “act[s] as a 
father toward his children.” But the mere existence of a biological link does 
not merit equivalent constitutional protection. . . . “[T]he importance of the 
familial relationship, to the individuals involved and to the society, stems 
from the emotional attachments that derive from the intimacy of daily 
association, and from the role it plays in ‘promot[ing] a way of life’ through 
the instruction of children as well as from the fact of blood relationship.” 

463 U.S. 248, 261 (1983) 
(citations omitted) (emphasis added). In Lehr, the Court held that a 
putative father who had never established a substantial relationship with his 
child was not entitled to notice of adoption proceedings as a matter of due 
process. 

 Id. at 
265. This Court, too, has long recognized that any 
constitutional interest a putative father may claim stems from his acceptance of 
“the legal and moral commitment to the family,” not from a mere biological 
relationship. In re K., 535 S.W.2d 168, 171 (Tex. 1976), cert. 
denied, 429 U.S. 907 (1976); see also In re T.E.T., 603 S.W.2d 793, 
795 (Tex. 1980), cert. denied sub nom., Oldag v. Catholic Charities of the 
Diocese of Galveston-Houston, 450 U.S. 1025 (1981) (holding that statute 
that imposed different requirements to establish parental rights on father than 
on mother did not violate father’s right to equal protection under the law); 
In re J.W.T., 872 S.W.2d 189, 195 (Tex. 1994) (noting that a father’s 
constitutional “interest does not come into existence or is soon lost, however, 
if the father is unable to demonstrate that he is fit and committed to the 
responsibilities of parenthood [or if the father has not] ‘taken concrete 
actions to grasp his opportunity to be a father’”) (quoting In re Adoption of 
B.G.S., 556 So.2d 545, 550 (La. 1990)). 
V         

 
Because the theories on which 
Duenas and Inocencio seek to reverse the court of appeals’ 
judgment were never presented in 
the trial court, they were not preserved for our review. Accordingly, we affirm 
the court of appeals’ judgment.
__________________________________________
Harriet O’Neill
Justice
OPINION DELIVERED: September 18, 
2003.