In the Interest of UNNAMED
BABY McLEAN.

No. 2–84–141–CV.

Court of Appeals of Texas,
Fort Worth.

Sept. 17, 1985.

Larry A. Gillen, Crampton, Crampton & Estrada and Holly Crampton, Wichita Falls, for appellant.

Anderson & Rodriguez and David K. Phillips, Wichita Falls, for Laura Lee McLean.

Jeanmarie Baer, Asst. County Atty. Wichita Falls, for Wichita County Family Court Services.

Merkle & Cannedy and Marty Cannedy, Wichita Falls, ad litem for the Child.

## OPINION

ASHWORTH, Justice.

Billy Dean Wise, appellant, appeals from a judgment denying his petition for voluntary legitimation and managing conservatorship of his biological child, the subject of this suit. Original petitioners and prospective adoptive parents, Charles and Constance Nartker, brought suit to terminate the parent-child relationship as to both Laura Lee McLean, the natural mother of the child, and appellant, the biological father of the child. Appellant filed a cross action for legitimation and managing conservatorship of the child, and the Nartkers took a nonsuit. Laura Lee McLean responded with a general denial to the cross-petition, praying that the biological father not be established as the legitimate father of the child and that no conservatorship orders be made. The Child Welfare Unit of Wichita County Family Court Services intervened seeking managing conservatorship of Baby McLean, and was supported by an affidavit executed by the natural mother, stating her desire that the child be placed with Child Welfare Unit and her opinion that the appellant is not a fit person to care for the child. Unnamed Baby McLean was represented by an attorney ad litem. After a trial to the court on the merits, the trial court denied legitimation and appointed Child Welfare managing conservator of the child.

We affirm.

Under the Texas Family Code, absent a marriage relationship between the father and mother of the child, the father is not a "parent" unless by force of TEX.FAM. CODE ANN. secs. 12.02 and 13.01 (Vernon 1975), neither of which is applicable in the instant case. However, TEX.FAM.CODE ANN. sec. 13.21 (Vernon Supp.1985) affords the biological father the opportunity to make his child legitimate and to become a "parent" with all the rights and duties inuring to all legitimate parents. *See* TEX. FAM.CODE ANN. sec. 13.09 (Vernon Supp.1985).

Section 13.21 provides in pertinent part:

(b) The court shall enter a decree designating the child as the legitimate child of its father and the father as a parent of the child if the court finds that:

(1) the parent-child relationship between the child and its original mother has not been terminated by a decree of a court;

(2) the statement of paternity was executed as provided in this chapter, and the facts stated therein are true; and

(3) the mother or the managing conservator, if any, has consented to the decree.

(c) The requirement of consent of the mother is satisfied if she is the petitioner. If the entry of the decree is in the best interest of the child, the court may consent to the legitimation of the child in

lieu of the consent of the mother or managing conservator.

*Id.*

In the case at bar, subsections (b)(1) and (2) of the foregoing statute were satisfied. The mother-child relationship had not been terminated and a statement of paternity was executed by the biological father. However, the natural mother did not consent under subsection (b)(3); therefore, the biological father sought the trial court's consent pursuant to subsection (c). After hearing the evidence, the trial court withheld its consent on the basis that it was in the "best interest of the child" to deny the petition for legitimation.

The trial court made the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The child the subject of this suit, Unnamed Baby McLean, male, was born on April 3, 1983.

2. Billy Dean Wise executed a statement of paternity on April 5, 1983.

3. The child's mother, Laura McLean, has never consented to the legitimization [sic] of the child as to Billy Dean Wise.

4. The child's mother, Laura McLean, has never executed an affidavit of relinquishment of parental rights as to the child the subject of this suit. The parent-child relationship between the child and Laura McLean has never been terminated by a decree in any court.

5. The child's mother, Laura McLean, executed an affidavit requesting the Child Welfare Unit of Wichita County Family Court Services take temporary custody of the child the subject of this suit.

6. The Supervisor of the Child Welfare Unit, Wichita County Family Court Services, was named temporary managing conservator of the child the subject of this suit on April 7, 1983.

7. The Supervisor of the Child Welfare Unit, Wichita County Family Court Services, as temporary managing conservator, has never consented to the legitim-

ization [sic] of the child as to Billy Dean Wise.

8. Billy Dean Wise is receiving 100% disability from the United States Marine Corp [sic] for a mental condition which has been diagnosed as paranoid schizophrenia, chronic.

9. Billy Dean Wise has an unstable employment history.

10. It is the desire of the mother of the child, Laura McLean, that the child be placed in an adoptive home. It is Laura McLean's opinion that such a placement would be in the child's best interest.

11. It is the desire of the Child Welfare Unit, Wichita County Family Court Services, temporary managing conservator, that the child be placed in an adoptive home. It is the opinion of the temporary managing conservator that such a placement would be in the child's best interest.

12. There are suitable adoptive placements available for the child the subject of this suit.

13. The entry of the requested decree of legitimization [sic] is not in the best interest of the child the subject of this suit.

### CONCLUSIONS OF LAW

1. The best interests of the child the subject of this suit are served by denying legitimization [sic] of the child as to Billy Dean Wise.

2. The requested decree of legitimization [sic] is denied.

The trial court made the following additional findings:

1. I find that the Petitioner, Billy Dean Wise, has provided for the emotional and physical needs of his children. I specifically find that the Petitioner has not abused, mistreated, or neglected his minor children and has provided proper parental guidance to them. I find that he has engaged in family recreational activities, and community youth activities with his children, has taken an interest in

their school activities and has provided the proper love, care, discipline, food, shelter, clothing, and other physical needs that his children require.

2. I find that the Petitioner has shown favorable parental abilities. I specifically find that he raised his children from infancy through adolescence, providing proper guidance, discipline, encouragement and love. I find that his children engaged in sports and other school activities, have average to above average grades, and exhibited good citizenships.

3. I find that the Petitioner desires to have managing conservatorship of the minor child, the subject of this suit. I specifically find that the Petitioner desires to take the child into his home and provide for his needs and welfare.

4. I find that the marriage of the Petitioner is currently stable. I specifically find that the Petitioner has been married to his wife for seventeen years. I find that marital difficulties developed during February 1982 and continued to September 1982. I find that Petitioner and his wife reconciled their differences in September 1982 and have lived together as husband and wife since that date without serious marital difficulties.

5. I find that the Petitioner has provided for, in the past, and can continue to provide for, in the future, the financial needs of his children. I specifically find that the petitioner receives approximately $1400.00 per month in disability from the Veteran's Administration, and earns approximately in excess of $600.00 per month from various forms of employment.

In his first point of error, appellant, biological father, contends that the trial court abused it discretion in not granting his petition for legitimation and managing conservatorship of the minor child because the court's findings do not establish that it is in the best interest of the child to deny legitimation. Appellant argues that he met his burden of proof in proving that it would be in the best interest of the child that the

child be legitimated as to him, the biological father. Having met this burden, appellant contends that he is entitled to legitimation under sec. 13.21(c) of the Texas Family Code. In essence, appellant is challenging the sufficiency of the evidence to support the trial court's judgment that the "best interest of the child" is served by denying the petition for legitimation.

Section 13.21(c) of the Family Code places the burden on the party seeking legitimation. There is no presumption the legitimation is in the child's best interest and the party seeking to legitimize the child must establish by a preponderance of the evidence that legitimation is in the best interest of the child when consent of the court is required under sec. 13.21(c). *In Interest of C__ D__ V__,* 589 S.W.2d 543, 547 (Tex.Civ.App.—Amarillo 1979, no writ). Further, it is the child's best interest, not the interest of the biological father, which must be served by legitimation. *See* sec. 13.21(c).

The evidence adduced at trial reflects that the child is the product of an illicit, extramarital affair between appellant and appellee, Laura McLean. Appellant, a 34-year-old man, has been married to his wife, Carolyn, for seventeen years and they have three teenage boys—17-year-old Jeff, 15-year-old Kerry and 14-year-old Jerry. They live in a four bedroom modular home on Lake Kickapoo. Marital problems developed between appellant and his wife in early 1982 resulting in appellant's having an affair with Laura, a carhop at a local drive-in. The affair lasted from February, 1982 until September 11, 1982, when appellant and his wife resolved their differences and reconciled. During his affair with Laura, appellant moved in and lived with Laura on two separate occasions—first, for a week in May and again from July 31st until September 11th, when he reconciled with his wife. During the affair, Laura on several earlier occasions told appellant that she was pregnant, but it developed she was not.

After appellant returned to his wife in September, Laura telephoned appellant's

wife, Carolyn, and threatened to bring a paternity suit against appellant. Carolyn told appellant about Laura's call, but appellant said that he did not believe that Laura was pregnant. Nothing more was heard from Laura. On April 4, 1983, appellant was contacted by a private detective who informed him that Laura had given birth to a baby and asked him to come down to a local attorney's office to sign some papers. Both appellant and Carolyn were shocked. They went to the attorney's office and after reading the papers, refused to sign. After discussing the situation with their sons, they decided to seek custody of the child. Appellant testified that within two days of the birth, he made arrangements to pay the hospital bill and, at the time of trial, had paid the balance down to about $2,000. (The original amount of the bill is not reflected in the record.)

Appellant testified that he quit high school in his 10th grade year and entered the Marine Corps. He served in the Marines from October 13, 1966 to May 15, 1970, when he was released on a physical disability discharge. While serving in Vietnam, appellant received a head injury when he fell into a pungi pit while walking point on patrol. He suffered a concussion and was treated at a field hospital and later treated at Wilford Hall Hospital in San Antonio. As a result of his head injury, appellant was unable to walk and had to go through extensive physical therapy and could not be around crowds of people. He suffered mental and emotional problems which resulted in his being unable to get along with his supervisors, experiencing memory lapses and black-outs, exhibiting violent behavior and going AWOL several times and, ultimately, resulted in his receiving a physical disability discharge. For three years after his discharge in May, 1970, appellant continued treatment for his mental disorder in the Veteran's Hospital in Oklahoma City on an outpatient basis. In 1981, appellant was re-evaluated and given 100% disability. Appellant still suffers from nightmares and a dislike of crowds. He has not been on any medication for some time.

Dr. Leon Morris, a clinical psychologist, testified that he examined appellant in August and September of 1983 and interviewed appellant's wife and three sons. Dr. Morris testified that appellant has suffered some permanent brain damage and is still suffering from some psychological trauma as a result of his combat injury. Dr. Morris noted that appellant suffered a very difficult period while recuperating and healing and was probably severely and emotionally disturbed for awhile immediately after his injury; however, appellant has improved to the point where he functions adequately and will continue to recuperate psychologically. Dr. Morris noted that appellant's military records indicate that when appellant was re-evaluated by the Marine Corps in January, 1981, and given 100% disability, no psychological testing nor psychiatric testing was conducted. Apparently, the re-evaluation was based on appellant's medical history and some observation resulting in a diagnosis of schizophrenia, paranoid type, chronic. Dr. Morris disagrees with the diagnosis although he did agree that appellant probably has been paranoid in the past and it is possible he might be in the future. Dr. Morris stated that appellant's unstable work record was related to his mental condition. When asked about the stigma placed on an illegitimate child by society causing problems for the child, Dr. Morris stated that it depended upon how the problem was handled within the family. He noted that appellant and his wife are raising two sons and one stepson and that he found no difference between the natural sons and the stepson. (When she and appellant married, Carolyn had an illegitimate son.) Dr. Morris stated that in his opinion based upon his examination of appellant and interviews with appellant's wife and three sons, appellant is emotionally and mentally well-qualified to raise a son. In answer on cross-examination as to appellant's parenting ability Dr. Morris stated:

A lot of things he does are close to the ideal. He is very involved in his boy's [sic] education and sports activities. He

participates a lot in these things. He is very supportive and very helpful. He believes in discipline, as far as I can understand, he is firm and consistent.

Dr. Morris agreed on cross-examination that it would not be harmful for appellant to be examined every year for the first few years to monitor his condition though apparently the doctor did not feel such was necessary. Dr. Morris diagnosed appellant as suffering from an organic brain syndrome and mild paranoia as a result of a head injury. In Dr. Morris's opinion appellant is mentally and emotionally able to care and provide loving care for a child.

Appellant's wife, Carolyn, testified that appellant is a loving father and husband, not prone to violence or excessive drinking. As a father he is attentive, but strict. He participates in the boys' activities such as baseball, scouts, and teaches them how to build things and work on cars and lawn mowers. The family is close knit and engages in numerous recreational activities such as camping, bowling, golfing, and fishing. Carolyn testified that appellant's past mental and emotional problems have not affected his ability to properly raise and support his family.

Carolyn's nursing supervisor at the hospital, Michelle Watson, and her husband, Garri Watson, a Master Sergeant in the United States Air Force, both testified that they have known appellant, Carolyn and their three sons about four years. The Watsons have two children, an eight-year-old son and a four-year-old daughter. The Watsons participate in social and recreational activities with appellant and his family two or three times a month. They described appellant as out-going, likeable and good with children. The Watsons' children are especially fond of appellant and call him "Uncle Bill." Neither has ever seen appellant exhibit malicious, destructive or violent behavior. Both describe appellant as a devoted father, strict but loving. They both describe appellant's three sons as courteous, well-mannered and well-behaved. Both testified that in their opinion appellant is a fit parent capable of raising

the child and that his parenting ability will not be affected by the fact that (1) the child is the result of an extramarital affair, (2) that appellant has been diagnosed as schizophrenic and receives military compensation, (3) appellant has worked at many different jobs, or (4) appellant has been arrested, though not convicted.

Appellant's three sons testified that they understand what happened, and do not condone what their father did, but have forgiven him and look forward to having their father's baby in the house. All three boys attend Holliday High School where they actively participate in athletics and other extracurricular activities such as the Rodeo Club and Future Farmers of America. Each maintains good grades and aspires to go to college. Each of the boys testified that their father disciplined them by restricting privileges such as use of the telephone or by grounding them and that they had never seen their father lose his temper and hit anyone. The boys are aware of their father's medical problems but have not found such to be a problem. It does not bother them that their father has held many jobs nor do they see such as a problem. Jeff described his father as a "jack-of-all-trades." The boys testified that both their parents have assumed responsibility for their raising on a 50–50 basis. The boys were all aware of why they were in court. Each boy expressed excitment about having the baby in their home.

Gerald W. Taylor, Assistant District Attorney, testified in regard to the indictment of appellant some four years earlier on a fraudulent check charge and that the charge had been dismissed the day of trial upon payment of the balance due on restitution.

At this point appellant rested his case.

Laura McLean testified that she told appellant in mid-September that she thought that she was pregnant and he told her that he would take care of everything if a doctor confirmed she was pregnant. Laura testified that she saw the doctor, got a letter from him that she was pregnant and mailed the letter to appellant's parents' ad-

dress. She called appellant's wife, Carolyn, and threatened a paternity suit. She made no more efforts to notify appellant of her pregnancy. She stated she would have gotten an abortion, but she was already 17 weeks pregnant and was advised it would be dangerous at that late date. Laura admitted that she told appellant earlier in March that she was pregnant and it turned out that she was not. She said that she was having medical problems then. Laura testified that even at that time appellant indicated his willingness to accept the responsibility and even seemed happy about the possibility of a baby.

Laura testified that appellant drank excessively and had a violent temper. She stated that on one occasion in late August, when returning by car from Six Flags, appellant became angry at her son and began driving the car fast and crazy. On another occasion, appellant tried to get her alcoholic brother to stop drinking by shoving him against a wall. Finally, about three days before appellant moved out in September, he got mad at her for coming home late and threw a mustard jar against the kitchen wall, knocked two holes in the bedroom door and would not let her go near her children. She admitted that they slept together that night and also, that she never asked appellant to move out. She admitted that during late August and early September, appellant took care of her children while she worked at night. She stated that appellant made her children call him "Daddy" and answer "Yes, sir" and "No, sir", and that her children did not like appellant. She testified that appellant lied to her throughout their relationship and that he is not a fit father.

After Laura testified, several of the people who had been interviewed by the social worker were called to testify. We note that in each case, the interviewees, when confronted with a copy of the social study report, testified that the comments attributed to them in the social study were incorrect. Apparently, the interviews were conducted by telephone and none of those interviewed had seen the social worker's write-up of his interview. Each testified that appellant was a good father, attentive and involved in his sons' activities. Wayne Roach testified that he has known appellant for about ten years. He and appellant fished together some and were involved in Little League together. Additionally, he and appellant got involved in a business venture which failed. When asked to read a portion of the social study in which he allegedly accused appellant of walking off a construction site with $400 worth of material, Roach stated that he did not say that. Further, he testified that appellant is a good worker, that he has not known of appellant being in trouble, that he has never known appellant to drink excessively nor get drunk, that he has never seen appellant lose his temper, although he has seen him mad, and that he has never known appellant to lie, although he does exaggerate. He never saw appellant mistreat his boys, although he felt appellant was too strict. He did not recommend that the baby be placed with appellant because he felt appellant should take care of the wife and three boys he has now.

David Crook, also interviewed by the social worker, testified that he had owned land on the lake near appellant about nine years ago, but has not seen appellant over a half dozen times in the past eight years. He describes appellant as having a "gift of gab". When shown the social study report, he said that he did not agree with what it reports him to have said in regard to appellant. Crook said that the report contained incorrect statements. He did not say that appellant did not pay attention to his bills and that was why appellant had an unlisted telephone number. He did not say that you can't believe everything appellant says. He did not say that appellant is not good to his kids because, as he stated in court, "I know damn well that he is." He did not say that appellant treated his kids like dogs. He did say that appellant demanded strict obedience. He testified that appellant was good to his boys and did not mistreat them, but he personally did not like the tone of voice appellant used to discipline the boys.

Dan Campbell, the attorney who was representing the Nartkers in the adoption case, testified that appellant and his wife came to his office at his request to discuss appellant's willingness to relinquish his parental rights to the baby. Appellant seemed pleasantly surprised and excited to hear about the baby. Campbell thought appellant's reaction odd since his wife was present, too. Campbell explained that the Nartkers wanted to adopt the baby. Appellant said he would not be willing to sign the relinquishment papers until he saw the baby and met the Nartkers. Campbell was surprised when appellant filed a legitimation suit two days later because he thought appellant would relinquish his rights. (We note that Campbell testified extensively to the excellent qualifications of the Nartkers. Such testimony is totally irrelevant to the case on trial.)

Patsy Baggett, Supervisor of the Wichita County Child Welfare Unit, testified that they did not recommend the child be placed with appellant for the following reasons:

(1) the instability of appellant's marriage as evidenced by his recent separation from his wife;

(2) appellant's involvement with another woman and getting her pregnant;

(3) appellant's transgressions of the law over the past years;

(4) appellant's inability to hold a job for any long period of time;

(5) appellant's medical history;

(6) appellant's weakness in paying his bills and expenses on time; and

(7) the disrespect appellant shows for his wife and children by his relationship with another woman.

■ It is well settled that a "best interest of the child" standard, in this context, confers discretion on the trial court to determine the fitness of one who would assume parental responsibility, and the decision will be set aside only if an abuse of discretion is shown. *In Interest of C— D— V—,* 589 S.W.2d at 546. *See Travis County Welfare Unit v. Vance,* 566 S.W.2d 112, 115 (Tex.Civ.App.—Austin,

1978, no writ.); *In Interest of K,* 535 S.W.2d 168, 170 (Tex.), *cert. denied,* 429 U.S. 907, 97 S.Ct. 273, 50 L.Ed.2d 189 (1976).

■ We have carefully considered all the evidence and conclude that the court's finding that it was in the best interest of the child to deny appellant's petition for voluntary legitimation was not so contrary to the great weight and preponderance of the evidence as to be clearly erroneous. *See In Interest of C— D— V—,* 589 S.W.2d at 546; *Travis County Welfare Unit v. Vance,* 566 S.W.2d at 115.

The evidence reflects that appellant has been a good father to his three teenage boys, and that he desires to raise his new son; however, it is not the best interest of the biological father which must be served, but the best interest of the child. The natural mother of the child and the Wichita County Welfare Unit maintain that the child's best interest would not be served by legitimating the child.

Although the record before us reflects that appellant proved his fitness as a parent, the applicable statute provides that appellant may prevail only if "entry of the decree is in the best interest of the child" *and* the trial court gives its consent. *See* sec. 13.21(c). However, the statute confers the discretion on the trial court to determine whether to grant or withhold its consent. The statute provides that "[i]f the entry of the decree is in the best interest of the child, the court *may* consent to the legitimation of the child in lieu of the consent of the mother ..." (Emphasis ours.) Clearly, the trial court has been given broad discretion in determining whether it would be in the best interest of the child to consent to legitimation. As stated by the Texas Supreme Court in discussing a trial court's broad discretion in determining the best interest of a child:

He has an opportunity to observe and evaluate the personalities of the contending claimants, to weigh the credibility of their testimony, to assess the physical, mental, moral and emotional needs of the child.

*Herrera v. Herrera,* 409 S.W.2d 395, 399 (Tex.1966).

Therefore, the trial court's judgment in determining whether the best interest of the child would be served by consenting to legitimation should be reversed only when it appears from the record as a whole that the court abused the discretion entrusted to him. *See id.* In light of the broad discretion conferred upon the trial court by sec. 13.21(c), we cannot find that the trial court abused its discretion in denying legitimation. Appellant's first ground is overruled.

■ In two points of error, appellant challenges the constitutionality of sec. 13.-21 of the Texas Family Code on the ground that it violates the due process and equal protection rights of the unwed biological father by imposing on him the burden of showing that legitimation is in the "best interest" of the child, an extremely difficult burden which the mother of the child is not required to meet. Appellant concedes that his contentions have been addressed and rejected by the Texas Supreme Court in *In Interest of T.E.T.,* 603 S.W.2d 793 (Tex. 1980), *cert. denied,* 450 U.S. 1025, 101 S.Ct. 1732, 68 L.Ed.2d 220 (1981). *See also In Interest of K,* 535 S.W.2d at 168. Appellant, however, relies on the dissenting opinion of Justice Steakley in *In Interest of T.E.T.,* joined by Justices Pope and Spears, who would hold that the gender-based distinction of the Texas statutory scheme for establishing status as a parent under sec. 13.21 has no constitutionally acceptable basis for its discrimination. Appellant invites us to rule adversely to the majority decision in *T.E.T.,* and adopt the dissent. This we decline to do.

In Justice Barrow's well-reasoned opinion in *T.E.T.,* the Court held that the constitutional rights of the unwed biological father to due process and equal protection are protected under the statutory scheme for establishing status as a parent and that the gender-based distinction is substantially related to the important state objective of promoting the best interest of children born out of wedlock and is substantially related to the achievement of this objective.

*In Interest of T.E.T.,* 603 S.W.2d at 797. As stated by the Court:

The narrow issue before us is whether the gender-based distinction of the Texas statutory scheme for establishing status as a parent is substantially related to the important state objective of promoting the best interest of children born out of wedlock and is substantially related to the achievement of this objective. We hold that it is so related. We believe that in the light of the "special difficulties" a mother faces at the birth and during the infancy of an illegitimate child this slight legislative distinction is justified. [Cite omitted.]

\* \* \* \* \* \*

Furthermore, the State has a legitimate interest in protecting the children who are born as a result of premarital sexual activity. The mother, by virtue of her pregnancy, is automatically responsible for the child. She has the physical burdens and responsibilities of the pregnancy. She can choose to abort the child or she may carry it full term. The State has a substantial interest in encouraging the unwed mother to properly care for the child by assuring her that her wishes as to the disposition of the child will not, absent her consent or a finding of the child's best interest, be subject to the absolute veto of the biological father. This statute is substantially related to the achievement of that interest.

*Id.*

In the instant case, appellant brought suit as permitted under the Texas Family Code sec. 13.21 to legitimate the child. A full and complete trial was held on the question of whether it was in the best interest of the child that legitimation be granted. The trial court found that it was not in the child's best interest and denied legitimation. Appellant was afforded an opportunity to be heard on the issue of what is in the best interest of the child. Appellant has been afforded due process and equal protection.

For the foregoing reasons, we overrule appellant's second and third points of error.

■ In a supplemental brief, appellant raises thirty (30) additional points of error in which he challenges the constitutionality of the statutory scheme contained in the Texas Family Code relative to fathers of illegitimate children. Specifically, appellant attacks TEX.FAM.CODE ANN. secs. 11.01(3) (Vernon 1975) (Definition of "Parent"), 11.01(8) (Vernon Supp.1985) (Definition of "Illegitimate Child"), 12.01 (Vernon 1975) (Relation of Child to Mother), 12.02 (Vernon 1975) (Relation of Child to Father), 13.21 (Vernon Supp.1985) (Voluntary Legitimation), and 15.02 (Vernon Supp.1985) (Involuntary Termination of Parental Rights) which appellant contends, subject unwed "male parents" to a different standard of treatment from unwed "female parents" based solely on their sex, male, and for no other reason in violation of due process, equal protection and equal rights guarantees of both the Texas and federal constitutions. *See* TEX. CONST. art. I., secs. 3, 3A, 19; U.S. CONST. amend. V and amend. XIV.

As earlier discussed, the Texas Supreme Court in *In Interest of T.E.T.*, 603 S.W.2d at 793, held that sec. 13.21, the Texas Voluntary Legitimation Statute, does not violate equal protection and due process clause guarantees because the gender-based distinction of the statutory scheme substantially relates to the important state objective of promoting the best interest of children born out of wedlock. Because the additional statutes now challenged all relate to the same statutory scheme, we hold the gender-based distinction of the challenged statutes do not violate due process and equal protection rights as guaranteed by the Texas and federal constitutions and points challenging the statutory scheme on this basis.

We now turn to appellant's contention that the statutory scheme violates the Tex-

as Equal Rights Amendment. TEX. CONST. art. I, sec. 3A. This same issue was addressed by the Eastland Court of Appeals in *In re Baby Girl S*, 628 S.W.2d 261 (Tex.App.—Eastland 1982, writ ref'd n.r.e.).[1] The Eastland Court held that sec. 13.21 does not violate the Texas Equal Rights Amendment because it meets the "compelling reasons" test as set forth in *Mercer v. Bd. of Trust., North Forest I.S.D.*, 538 S.W.2d 201 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). In *Mercer*, the Houston Fourteenth Court of Appeals in considering whether a regulation regarding school hair length violated the Texas Equal Rights Amendment thoroughly considered and compared similar enactments by other jurisdictions as well as federal court decisions and stated:

We cannot agree with the Supreme Court of Washington that the ERA [Equal Rights Amendment] admits of no exceptions to its prohibition of sex discrimination. Any classification based upon sex is a suspect classification,a nd any law or regulation that classifies persons for different treatment on the basis of their sex is subject to strictest judicial scrutiny. Any such classification must fall unless the party defending it can show that it is required by (1) physical characteristics, (2) other constitutionally protected rights such as the right of privacy, or (3) other "compelling reasons." With respect to "physical characteristics" we are simply recognizing the facts of life. For us to adjudicate that women are men would be as futile as it would be absurd. Neither the ERA nor the rights established by it require us to construe it so as to deny sexual or reproductive differences between the sexes. Nor does the ERA require that such rights so established (and so long denied) be enforced where they come into conflict with other basic fundamental constitutionally-protected rights such as that of privacy. To justify a suspect classification by

---

1. This case was originally decided by the Eastland court at 628 S.W.2d. The U.S. Supreme Court later, in a memorandum opinion, vacated the judgment of this court and remanded the cause. Then the Eastland court at 658 S.W.2d 794 (Tex.App.—Eastland 1983, writ ref'd n.r.e.) reinstated its original opinion.

"compelling reasons" places the burden of proof and persuasion on the party defending the classification.

*Id.* at 206.

In light of the fact that the Texas Supreme Court has found that the gender-based distinction in the Texas statutory scheme in regard to sec. 13.21 substantially relates to the achievement of a legitimate State interest in protecting children who are born out of wedlock, *In Interest of T.E.T.*, 603 S.W.2d at 797; *In Interest of K*, 535 S.W.2d at 171, and because the additional statutes now complained of all relate to the same statutory scheme, we overrule appellant's remaining points of error, and we find the gender-based distinction is justified by the compelling State interest in protecting children born out of wedlock.

For the foregoing reason, we overrule appellant's thirty (30) supplemental points of error.

Judgment affirmed.

FENDER, C.J., and BURDOCK, HOPKINS, JJ. and HUGHES, J., Retired (Sitting by Assignment), join.

HILL, J., dissents.

HILL, Justice, dissenting.

I respectfully dissent, adopting the reasoning of the dissenting opinion in *In Interest of T.E.T.*, 603 S.W.2d 793 (Tex.1980). I find the majority opinion in *T.E.T.* and the majority opinion in this case to be inconsistent with the constitutional principles expressed in the cases of *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) and *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).

In *Caban*, the Supreme Court declared unconstitutional sec. 111 of the New York State Domestic Relations Law (McKinney 1977), which permitted an unwed mother, but not an unwed father, to block the adoption of their child simply by withholding consent. Justice Powell, writing for the majority, said:

The State's interest in providing for the well-being of illegitimate children is an important one. We do not question that the best interests of such children often may require their adoption into new families who will give them the stability of a normal, two-parent home. Moreover, adoption will remove the stigma under which illegitimate children suffer. But the unquestioned right of the State to further these desirable ends by legislation is not in itself sufficient to justify the gender-based distinction of sec. 111. Rather, under the relevant cases applying the Equal Protection Clause it must be shown that the distinction is structured reasonably to further these ends. As we repeated in *Reed v. Reed*, 404 U.S. [71], at 76, 92 S.Ct. [251], at 254 [30 L.Ed.2d 225 (1971)], such a statutory 'classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstances shall be treated alike." *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, [40 S.Ct. 560, 561, 64 L.Ed. 989] (1920).'

We find that the distinction in sec. 111 between unmarried mothers and unmarried fathers, as illustrated by this case, does not bear a substantial relation to the State's interest in providing adoptive homes for its illegitimate children. It may be that, given the opportunity, some unwed fathers would prevent the adoption of their illegitimate children. This impediment to adoption usually is the result of a natural parent interest shared by both genders alike; it is not a manifestation of any profound difference between the affection and concern of mothers and fathers for their children. Neither the State nor the appellees have argued that unwed fathers are more likely to object to the adoption of their children than are unwed mothers; nor is there any self-evident reason why as a class they would be.

*Id.* 441 U.S. at 391–92, 99 S.Ct. at 1767–68.

The Court limited its decision to older children and not newborns, saying:

Even if the special difficulties attendant upon locating and identifying unwed fathers at birth would justify a legislative distinction between mothers and fathers of newborns, these difficulties need not persist past infancy.

*Id.* at 392, 99 S.Ct. at 1768.

The Court then proceeded to discuss, in the context of the older child, whether the State's interest in proceeding with adoption cases can be protected by means that do not draw such an inflexible gender-based distinction. The Court said:

In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child. Indeed, under the statute as it now stands the surrogate may proceed in the absence of consent when the parent whose consent otherwise would be required never has come forward or has abandoned the child. See, *e.g.*, *In re Orlando F.*, 40 N.Y.2d 103, 386 N.Y.S.2d 64, 351 N.E.2d 711 (1976). But in cases such as this, where the father has established a substantial relationship with the child and has admitted his paternity, a State should have no difficulty in identifying the father even of children born out of wedlock. Thus, no showing has been made that the different treatment afforded unmarried fathers and unmarried mothers under sec. 111 bears a substantial relationship to the proclaimed interest of the State in promoting the adoption of illegitimate children.

In sum, we believe that sec. 111 is another example of "overbroad generalizations" in gender-based classifications. See *Califano v. Goldfarb*, 430 U.S. 199, 211, 97 S.Ct. 1021, 1029 51 L.Ed.2d 270 (1977); *Stanton v. Stanton*, 421 U.S. 7, 14–15, 95 S.Ct. 1373, 1377–1378, 43 L.Ed.2d 688 (1975). The effect of New York's classification is to discriminate against unwed fathers even when their identity is known and they have manifested a significant paternal interest in the child. The facts of this case illus-

trate the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children. Section 111 both excludes some loving fathers from full participation in the decision whether their children will be adopted and, at the same time, enables some alienated mothers arbitrarily to cut off the paternal rights of fathers. We conclude that this undifferentiated distinction between unwed mothers and unwed fathers, applicable in all circumstances where adoption of a child of theirs is at issue, does not bear a substantial relationship to the State's asserted interests.

*Id.*, 441 U.S. at 392–94, 99 S.Ct. at 1768–69.

When the question of requiring an unwed father, but not an unwed mother, to establish parental status in a legitimation proceeding came before the Texas Supreme Court in the case of *In Interest of T.E.T.*, the majority of that Court attempted to distinguish the *Caban* case from the case before it on the basis that the child in *T.E.T.* was a newborn child with which the father only had a potential relationship, whereas the child in *Caban* was an older child with which the father had an established relationship. *In Interest of T.E.T.*, 603 S.W.2d at 797–98. Justice Barrow, writing for the majority, relied on the "special difficulties" discussed in *Caban*. *Id.* The "special difficulties" discussed in *Caban* were the special difficulties attendant upon locating and identifying unwed fathers at birth which "need not persist past infancy." *Caban v. Mohammed*, 441 U.S. at 392, 99 S.Ct. at 1768. In the case before us today, the natural father not only was located and identified at birth, but, unlike the father in *Caban*, was actually in court seeking to exercise his full responsibility as a parent. Since the "special difficulties" referred to in *Caban* did not exist in this case even in infancy, there is no reason why the rule stated in *Caban* should not be applicable.

In addition to *In Interest of T.E.T.*, the majority of this court also relies on the cases of *In Interest of K.*, 535 S.W.2d 168 (Tex.1976) and *In re Baby Girl S.*, 628 S.W.2d 261 (Tex.App.—Eastland 1982, writ ref'd n.r.e.).[1]

As noted by the dissent in *T.E.T.*, the case of *In Interest of K.* was decided before the opinion announced in *Caban*, which established a more stringent test to be used in determining equal protection claims. *In Interest of T.E.T.*, 603 S.W.2d at 799. The *Baby Girl S.* case is based on the majority opinion in *T.E.T. In re Baby Girl S.*, 628 S.W.2d at 262–64. While the *Baby Girl S.* case is factually comparable to this case, I differ with its legal conclusion because of its conflict with the principles expressed in *Caban*.

Although this court must ordinarily defer to the opinions of the Texas Supreme Court, we are bound by the decisions of the United States Supreme Court, in questions involving the United States Constitution. *See* 21 C.J.S. *Courts* sec. 206 (1940) and cases cited therein. I would sustain appellant's points of error dealing with equal protection.

The cases of *Caban* and *T.E.T.* were both decided based upon what is called the "intermediate standard" of equal protection analysis, which the Supreme Court of the United States has adopted in cases where the questioned classification is based on sex. *See Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). The intermediate standard examines the classification to see if it is substantially related to an important state interest. *Id.* at 197, 97 S.Ct. at 456. Appellant's claim under the Texas Equal Rights Amendment must be analyzed using the "strict scrutiny" test for equal protection analysis, a more stringent standard. *Mercer v. Bd. of Trust., North Forest I.S.D.*, 538 S.W.2d 201, 206 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.). For a discussion of the equal protection analysis tests, *see Annot.*, 60 L.Ed.2d 1188, 1190–92 (1980). Any such classification must fall unless the party defending it can show that it is required by (1) physical characteristics, (2) other constitutionally protected rights such as the right of privacy, or (3) other compelling reasons, which means that it must be established that the differential treatment is necessary to promote a compelling state interest. *Mercer v. Bd. of Trust., North Forest I.S.D.*, 538 S.W.2d at 206; *see Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). A compelling state interest is one which the state is forced or obliged to protect. *Dunham v. Pulsifer*, 312 F.Supp. 411, 417 (D.Vt.1970). *Coleman v. Coleman*, 32 Ohio St.2d 155, 291 N.E.2d 530, 534 (1972); It must further be shown that the compelling state interest may not be accomplished by other reasonable means, without the necessity of the suspect classification. *Dunn v. Blumstein*, 405 U.S. at 343, 92 S.Ct. at 1003.

I would find that the appellees have failed to meet their burden in showing that any compelling state interest requires the automatic deprivation of parental rights of an unwed father whose identity and location are known at the time of birth, and who from the time of birth has actively sought a custodial, personal, and financial relationship with his child. Appellees have also failed to show that there are no other reasonable means to terminate an unwed father's parental rights as might be accomplished through a termination proceeding under Chapter 15 of the Texas Family

---

1. The United States Supreme Court granted the father's petition for writ of certiorari in *Baby Girl S.*, then vacated the judgment and remanded the cause to the Eastland Court to determine whether the natural father could have obtained and might still obtain a decree designating him as the father of the child pursuant to the paternity suit provisions of the Texas Family Code (Sections 13.01–13.09), without a showing of best interest. *Kirkpatrick v. Christian Homes of Abilene*, 460 U.S. 1074, 103 S.Ct. 1760, 76 L.Ed.2d 337 (1983). Upon remand, the Eastland court found that it had no authority to remand an errorless judgment for proceedings under a different theory and reinstated its judgment. *In re Baby Girl S.*, 658 S.W.2d 794, 796 (Tex.App.—Eastland 1983, writ ref'd n.r.e.). That decision was not appealed to the United States Supreme Court.

Code. The opinion of the Eastland Court in *In re Baby Girl S.*, is based on the majority opinion in *T.E.T. In re Baby Girl S.*, 628 S.W.2d at 262–64. The Texas Supreme Court has not ruled on this question. I would sustain appellant's point of error based upon the Texas Equal Rights Amendment.

With respect to the appellant's due process claim, the majority opinion in *Lehr v. Robertson*, which was decided after *In Interest of T.E.T.*, discusses the unwed father's inchoate right to establish a relationship with his child. This case, if construed very strictly, is only authority for the requirement of notice of adoption to someone, such as the appellant, who has tried to establish a relationship with his child. However, the language used in *Lehr* also infers a right of a natural father, if he seeks to do so in a timely fashion, to establish a relationship with his child. *See In re Baby Girl M.*, 37 Cal.3d 65, 207 Cal.Rptr. 309, 315, 688 P.2d 918, 924–25 (1984) and Buchanan, *The Constitutional Rights of Unwed Fathers Before and After Lehr v. Robertson*, 45 OHIO ST.L.J. 313–382 (1984). In *Lehr*, the Court held that the State of New York did not violate the rights of an unwed father by failing to give him notice prior to the adoption of his child by the child's stepfather, even though he had a visitation and paternity action pending at the time of the adoption. In the two years since the child's birth, Lehr had not taken any legal steps to establish a parental relationship with the child and had not otherwise established such a relationship. With respect to Lehr's due process claim, the Court held that the mere existence of a biological link does not merit equivalent constitutional protection, as compared to an unwed father who demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, by acting as a father toward his children. *Lehr v. Robertson*, 103 S.Ct. at 2993. Such a father's interest in personal contact with his child acquires substantial protection under the due process clause. *Id.* Justice Stevens said that:

[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.... Appellant has never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until after she was two years old. We are concerned only with whether New York has adequately protected his opportunity to form such a relationship.

*Id.* at 2993–94.

Justice Stevens then discussed the New York statutory scheme which establishes a putative father registry, a mechanism established to enable an unwed father to register his relationship with his child. *Id.* at 2994–95. The Court concluded the discussion of the father's due process claim by saying that it was without merit "[s]ince the New York statutes adequately protected appellant's inchoate interest in establishing a relationship." *Id.* at 2995.

In the case at bar, the State of Texas protected appellant's right to notice, but it prevented, rather than protected, his inchoate right to establish, on a timely basis, a relationship with his child. For that reason, I would sustain appellant's points of error dealing with due process.

I would reverse the judgment of the trial court, render judgment that appellant is a parent of Baby Boy McLean, and remand this cause to the trial court for further proceedings consistent with this opinion.

JOE SPURLOCK II, J., joins.